**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**JAMES HARRISON,**

                                        **Plaintiff,**

        **vs.**                                                    **3:13-CV-835**
                                                                   **(FJS/CFH)**

**CAROLYN W. COLVIN,**
**Commissioner of Social Security,**

                                        **Defendant.**

_____

**APPEARANCES:**                                    **OF COUNSEL:**

LACHMAN & GORTON                                    Peter A. Gorton, Esq.
1500 E. Main Street
P.O. Box 89
Endicott, New York 13761
_Attorney for Plaintiff_

Social Security Administration                      Tomasina DiGrigoli, Esq.
Office of General Counsel                           Stephen P. Conte, Esq.
26 Federal Plaza, Rm. 3904
New York, NY 10278
_Attorney for Defendant_

**Christian F. Hummel, U.S. Magistrate Judge:**

### REPORT-RECOMMENDATION AND ORDER[1]

### INTRODUCTION

        Plaintiff James Harrison, brings the above-captioned action pursuant to 42 U.S.C. § 405(g)

seeking a review of the decision from the Commissioner of Social Security ("Commissioner") that

denied his application for disability insurance benefits ("DIB").

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)
and N.D.N.Y.L.R. 72.3(d).

# PROCEDURAL BACKGROUND

On October 13, 2009, plaintiff protectively filed an application for DIB benefits. (T. 255, 261, 287)[2]. Plaintiff was 36 years old at the time of the application with prior work experience in the food service industry as an assistant manager and shift supervisor, factory work and a laborer. (T. 293). Plaintiff claimed that he became unable to work beginning on December 2, 2008, due to traumatic injuries sustained in an automobile accident in 2003 including arthritis in his left knee, degenerative disc disease in his lower back, pain in his left hip, left elbow and right shoulder. (T. 292).[3]

On December 29, 2009, plaintiff's application was denied and plaintiff requested a hearing by an Administrative Law Judge ("ALJ"), which was held on December 22, 2010. (T. 113, 118). Plaintiff appeared with an attorney. At the end of the hearing, the ALJ advised plaintiff's counsel that he would be retaining a medical expert and that the expert would be available for cross-examination. (T. 112). Donald Goldman, M.D. was retained as the agency's medical expert and asked to review plaintiff's medical records and provide responses to various interrogatories. (T. 16). The second hearing was scheduled for April 20, 2011 but was adjourned because Dr. Goldman did not receive additional medical records from plaintiff's counsel. (T. 75). On July 20, 2011, the second administrative hearing was held. The hearing began at 9:08 a.m. and ended at 10:14 a.m. (T 14. - 66). On September 13, 2011, the ALJ issued a decision denying plaintiff's claim for benefits. (T. 118-141). The Appeals Council denied plaintiff's review on June 15, 2012, making the ALJ's decision the final determination of the Commissioner. (T. 1-4). This action followed.

---

[2]"(T.)" refers to pages of the Administrative Transcript, Dkt. No. 10.

[3] Claimant amended his onset date to January 15, 2009. (T. 118).

## FACTUAL BACKGROUND AND MEDICAL EVIDENCE

On April 26, 2003, plaintiff was involved in a motorcycle accident and, as a result, plaintiff was hospitalized from the date of the accident until May 16, 2003. (T. 509-522). Plaintiff sustained the following relevant injuries: left femur fractures; comminuted left elbow fracture; left tibial plateau fracture; and right foot fracture. Plaintiff underwent surgery including open reduction, internal fixation of his left femoral neck and mid shaft femur fractures and surgical repair of his left elbow. After recovering, plaintiff stopped treating and returned to work. (T. 87). From 2007 until 2008, plaintiff worked at various fast food/restaurants as a shift supervisor and assistant manager. During his administrative hearing, plaintiff testified that he stopped working in November 2008, for "health reasons" and began treating with James Brunt, P.A. At the time, plaintiff was working as a cook and testified that the job required standing and lifting twenty pounds or more. (T. 85). For one month, from September 2009 to October 2009, plaintiff worked in a factory as a laborer.[4] (T. 293).

**James Brunt, P.A.**

On November 4, 2008, plaintiff appeared for an initial consultation with Lourdes Primary Care. (T. 561). On November 10, 2008, plaintiff complained of joint pain. Upon examination, P.A. Brunt noted that plaintiff exhibited a full range of motion, without tenderness, in his back and knee. P.A. Brunt prescribed Flexeril and Ultram.[5] (T. 422). P.A. Brunt noted the results of x-rays taken of plaintiff's lumbar spine and faxed the reports to plaintiff's physicians at Tier

---

[4] Plaintiff did not mention this work during his administrative hearing.

[5] Flexeril is a skeletal muscle relaxant for relief of muscle spasms. *Dorland's Illustrated Medical Dictionary*, 465, 725 (31st ed. 2007). Ultram is used for the treatment of moderate to moderately severe pain following surgical procedures. *Id*. at 2027.

Orthopedics.[6] (T. 422).  Plaintiff returned for sixteen visits with P.A. Brunt from November 2008 through November 2010 and complained of chronic pain and depression.  From November 2008 through October 2009, P.A. Brunt consistently noted that plaintiff was not in acute distress and exhibited "full active and passive range of motion with tenderness" and "full range of motion of upper and lower extremities with tenderness to palpation". (T. 415- 421).   In December 2009, plaintiff exhibited a decreased range of motion after lifting a pot of potatoes he was cooking.  (T. 659).  P.A. Brunt continued to note a "limited range of motion" during monthly visits from February 2010 through May 2010.   While plaintiff appeared for examinations in June 2010 and July 2010, those visits involved complaints of depression only.  During that time, plaintiff claimed that he was depressed but "more active with the kids".  (T. 653).   In August 2010, P.A Brunt noted that plaintiff exhibited a full range of motion and in November 2010, at his last recorded visit, plaintiff was in "no acute distress", exhibited a full range of motion and complained of pain in his left elbow. (T. 651). P.A. Brunt prescribed various medications including Vicodin and Percocet and referred plaintiff to Regional Rheumatology and pain management.[7]

On November 8, 2010, Brunt completed a "Questionnaire" based upon his examinations from November 2008 through November 2010.[8]  In response to Questions 1 and 3, Brunt checked off boxes indicating that plaintiff required more than one - ten minute rest period per hour and that

---

[6] The diagnostic studies are addressed *infra*.

[7] Vicodin is a semisynthetic opioid analgesic derived from codeine but having more powerful sedative and analgesic effects. *Dorland's* at 890, 2084.  Percocet is a mixture of oxycodone hydrochloride and acetaminophen used for the relief of moderate to moderately severe pain.  *Physicians' Desk Reference,* 973 (47th ed. 1993) [hereinafter PDR ].

[8] The Questionnaire directs the author as follows:

FOR THE BALANCE OF THE QUESTIONS HEREIN, PLEASE STATE YOUR ANSWERS BASED UPON THE LIMITATIONS (IF ANY) THAT THE PATIENT SUFFERS FROM WHICH ARE CONSISTENT WITH THE PHYSICAL CONDITION OF THE PLAINTIFF

he could not sit for more than 6 hours without alternating positions and could not lift. Question 4 asks the writer to "state what effect, if any, patients medical condition would have on patient's abilities" in concentration and the ability to sustain work pace. In response, P.A. Brunt wrote "mild". P.A. Brunt diagnosed plaintiff with "multiple fractures with motorcycle accident". (T. 642-645).

**Tier Orthopedic Associates**

On November 2008, plaintiff appeared at Tier with complaints of back pain with spasms. Plaintiff noted he "has spasms intermittently and this has been a problem since surgery. And overall, he just wanted to be reviewed". Plaintiff was examined by Helen Harris, P.A. P.A. Harris reviewed plaintiff's November 4, 2008 diagnostic films and noted that the reports were "very indistinguishable, it is just not grossly abnormal". P.A. Harris noted that plaintiff was in no acute distress and exhibited some soreness in the lumbar area; plaintiff sat comfortably; his arms and hips showed reasonable range of motion; there was some crepitus and diminished flexion in his left knee. P.A. Harris diagnosed plaintiff with mid to low back pain and noted that therapy was his best option. (T. 553).

On December 10, 2008, P.A. Harris noted that plaintiff only had one therapy visit because "he had to make sure he was approved for more because of insurance". Plaintiff also moved his residence and claimed he was "worse" since last visit. P.A. Harris noted that plaintiff's physical examination was unchanged. P.A. Harris continued to opine that therapy was plaintiff's best option. (T. 554). On November 9, 2009, an office note from Tier Orthopedics to the New York State Office of Temporary Disability Assistance advised that plaintiff had not been treated at Tier since December 2008. (T. 447).

**Regional Rheumotology Associates**

On January 5, 2009, plaintiff appeared at Regional Rheumatology Associates for an initial consultation. (T. 407). Plaintiff was referred by James Blunt, P.A. for complaints of chronic pain in his lower back. Plaintiff was examined by P.A. D'Angelo who noted that plaintiff was scheduled to begin physical therapy at the request of his orthopedic providers. P.A. D'Angelo prescribed Flexeril, ordered x-rays and referred plaintiff to Dr. Oven for a further examination. On January 21, 2009, plaintiff was examined by Dr. Oven with complaints of pain in his left knee and back. Plaintiff denied experiencing any radiculitis. Upon examination, Dr. Oven noted that plaintiff was in no acute distress, could not move his left elbow and experienced tenderness in his lower back. Range of motion was painful in his left knee. Dr. Oven diagnosed plaintiff with chronic back pain and noted that excessive alcohol abuse predisposed plaintiff to compression fractures. (T. 392-394). Dr. Oven ordered blood work, physical therapy and prescribed Vicodin and Relafin.[9]

On February 26, 2009, plaintiff returned complaining of back pain, left arm and left leg pain. Plaintiff was taking his medication and P.A. D'Angelo noted that plaintiff's blood work and bone density testing was normal. Upon examination, plaintiff exhibited restricted range of motion in his left elbow due to arthritis, a good grip and tenderness in his lumbar area. His shoulders, knees, ankles and hips were normal. P.A. D'Angelo diagnosed plaintiff with chronic thoracolumbar back pain with facet degeneration and mild disk bulge with encroachment and noted that plaintiff suffered from anterior compression deformities which are related to his prior

---

[9] Relafin is the brand name for a preparation of nabumetone, a nonsteroidal antiinflammatory drug. *See Dorland's,* 1248, 1645.

motorcycle accident and "possibly also due to prior history of alcohol abuse". (T. 391). P.A. D'Angelo directed plaintiff to continue his medication and to begin physical therapy.

In April 2009, plaintiff returned for the same complaints. P.A. D'Angelo noted that plaintiff began physical therapy and that plaintiff was taking Percocet. Upon examination, plaintiff exhibited good grip strength bilaterally; chronic deformity of the left elbow with limited range of motion; tenderness in the lumbar region; shoulders, ankles, knees and hips moved well. P.A. D'Angelo advised plaintiff to continue with the same course of treatment.

In June 2009, plaintiff advised Dr. Oven that he was out of work but working on his home and putting siding up. Upon examination, Dr. Oven noted that plaintiff exhibited good range of motion in his cervical spine, tenderness in the lumbar spine and a normal gait. Dr. Oven prescribed Percocet, Flexeril and Lodine.[10] (T. 389). In August 2009, plaintiff advised that he was taking Percocet four times a day. Upon examination, P.A. D'Angelo noted that plaintiff displayed limited mobility in his left elbow but the doctor also noted that his "elbows move well". Plaintiff's ankle, knees and hips moved well and he exhibited good grip strength with mild tenderness in his lumbar region. Plaintiff was advised to consider a course of steroid injections as recommended by his other providers.

On March 31, 2010, P.A. D'Angelo and Dr. Oven completed a "Questionnaire".[11] The answers to the questions were based upon an examinations from November 2009 through December 2009.[12] They opined that plaintiff must be given the freedom to rest due to osteoarthritis in multiple joints and degenerative disc disease. (T. 707-709). They concluded that

---

[10] Lodine is a nonsteroidal antiinflammatory drug used to treat arthritis. *Dorland's* at 660, 1088.

[11] The Questionnaire was the same form completed by P.A. Brunt.

[12] The record does not include any medical records from the November 2009 and December 2009 examination.

7

plaintiff would be "periodically absent" from work due to flaring of his symptoms. They opined that plaintiff could not sit for prolonged periods of time and less than six hours in an eight hour workday with the opportunity to alternate positions; could not stand for two hours; and could lift 0 - 5 pounds three hours per day.

In April 2010, plaintiff claimed that his pain was worse by the day and that he experienced hip pain. Upon examination, P.A. D'Angelo noted that plaintiff walked with a cane and that he was unable to lie flat on the table. Plaintiff exhibited limited mobility in his joints including his left elbow and he was "exquisitely tender" in his lumbar spine. Plaintiff's joints in his lower extremities "move reasonably well" with pain on flexion of the left hip. Plaintiff was diagnosed with osteoarthritis and prescribed Norflex, Percocet and Lyrica.[13] (T. 674). Plaintiff returned in May 2010, July 2010, August 2010, November 2010 and February 2011 with the same complaints of pain. During the last examination, D'Angelo noted that plaintiff displayed good grip strength with limited mobility in the left elbow; no tenderness in the cervical or thoracic spine; some pain in the lower lumbar regions; and ankles, knees and hips moved well with some weakness in the left hip flexor. (T. 710). Dr. Oven and P.A. D'Angelo noted that plaintiff's examination was unchanged and his course of treatment remained the same. Dr. Oven and P.A. D'Angelo completed a document entitled "Addendum to Questionnaire" on October 28, 2010 and April 5, 2011 stating that plaintiff's condition and limitations were the same. (T. 827).

**Xiao Fang, M.D.**

---

[13] Lyrica is a medication used to relieve neuropathic pain and to relieve the pain of fibromyalgia. www.ncbi.nim.nih.gov/pubmedhealth/PMH0000327.

On March 10, 2010, Dr. Fang, a physician affiliated with the Center for Pain Relief, completed a Questionnaire.[14] The Questionnaire is dated March 10, 2010 and based upon an examination on February 18, 2010.[15] Dr. Fang diagnosed plaintiff with lumbar spondylosis and opined that plaintiff required more than one - ten minute rest period per hour each day. Dr. Fang concluded that plaintiff could sit for six hours in an eight hour workday but that he was required to alternate positions. Plaintiff could stand for two hours in an eight hour work day and could lift more than ten pounds for three hours. Dr. Fang noted that plaintiff's impairments moderately impacted his concentration and pace and that plaintiff's prescription for Oxycodone did not create any side effects. (T. 614-616).

On September 23, 2010, plaintiff appeared for an examination with Dr. Fang complaining of pain, depression and arthritis. Plaintiff indicated that he tried injections and that they aggravated his condition. Upon examination, Dr. Fang noted that plaintiff was not in distress; able to ambulate with and without a cane, his gait with chronic back pain and degenerative disc disease and recommended physical therapy. (T. 627).

On October 18, 2010, plaintiff re-appeared for an examination and Dr. Fang noted that plaintiff had not started physical therapy. Upon examination, Dr. Fang noted that plaintiff ambulated with a cane and exhibited a slow gait and tenderness. (T. 626). On October 28, 2010, Dr. Fang executed an Addendum to his Questionnaire indicating that his opinions were the same. (T. 625). In January 2011 and March 2011, plaintiff returned to Dr. Fang with the same complaints. Dr. Fang noted that plaintiff ambulated with a cane and that his gait was slow but had

---

[14] The Questionnaire is the same form executed by D'Angelo/Oven and Brunt.

[15] The first record of any examination by Dr. Fang is September 23, 2010. Indeed, as discussed *infra*, the record does not contain any record documenting an examination on February 2010.

improved. Plaintiff was not in distress and was "well developed and "well nourished" and exhibited a decreased range of motion in his lumbar spine. Dr. Fang diagnosed plaintiff with chronic back pain and degenerative disc disease. Dr. Fang suggested that he continue physical therapy. (T. 704).

**Diagnostic Imaging**

On November 4, 2008, x-rays were taken of plaintiff's lumbar spine at the request of P.A. Brunt. The films revealed normal alignment and a wedge compression deformity at T11, T12 and L1. The vertebral and disc height were maintained and facets were normal. Other than the compression deformities, the study was "otherwise negative". (T. 427). On November 10, 2008, x-rays were taken of plaintiff's left knee at P.A. Brunt's request. The films revealed "cortical irregularities, sclerosis and cyst formation with the patella consistent with healing" and effusion. (T. 438).

On January 24, 2009, a CT scan of plaintiff's thoracic spine (ordered by P.A. D'Angelo) revealed minimal degenerative changes and a scan of the lumbar spine revealed mild degenerative changes at L4-5 and L5-S1 with minimal narrowing. (T. 401- 406).

In August 2009, x-rays were taken of plaintiff's lumbar spine at the request of Dr. Khalid Sethi.[16] The films revealed minor lumbar levoscoliosis with mild disc space narrowing at L5-S1. The radiologist noted, "no definite abnormal mobility is seen during flexion/extension" and vertebral heights were "maintained". (T. 387).

On January 29, 2010, x-rays were taken of plaintiff's lumbar spine at P.A. D'Angelo's request. The films revealed normal alignment and maintained lordosis of the lumbar spine with

_____

[16] The record does not contain any treatment notes from by Dr. Sethi.

no spondylolysis or spondylolisthesis.  The impression was "unremarkable lumbar spine".  (T. 662).

**Nadhia Celestin, M.D.**

On December 16, 2009, plaintiff appeared, at the request of the agency, for an internal medicine examination with Nadhia Celestin, M.D.  (T. 452).  Dr. Celestin noted that plaintiff had various complaints to several parts of his body.  Plaintiff described throbbing pain in his lower back that radiated to his right side.  Plaintiff described the pain as "10/10" and "constant" and increased with prolonged standing and sitting.  Plaintiff stated that medications did not help with the pain but that his TENS unit and heat provided some relief.  Plaintiff also described left hip pain as "constant" and "7/10" and left knee pain as "10/10" and "achy".  Plaintiff complained that his left elbow did not "straighten out" after his accident and that he experiences pain that he described as "5/10" and "constant/dull".   Plaintiff complained of sharp, constant pain in his shoulder that he described as "10/10".   Plaintiff lived with his three children and stated that he is able to cook, clean, do laundry, shop, draw and watch television.  Upon examination, Dr. Celestin noted that plaintiff was in acute distress; his gait was hunched and stooped secondary to pain and unsteady.  Plaintiff appeared with a cane that he stated was necessary and medically prescribed. Plaintiff stated that he had bilateral knee braces that he did not bring to the examination.  Plaintiff needed assistance climbing on and off of the table and to rise from a chair.  Dr. Celestin noted that plaintiff had full range of motion in his cervical spine and no abnormality in his thoracic spine; flexion and extension of the lumbar spine was not tested due to pain; straight leg raising was positive on the right at 30 degrees and negative in a supine position; and plaintiff's range of motion in his shoulder, knee and elbow were limited.   Dr. Celestin diagnosed plaintiff with a

history of degenerative disc disease in his lower back and bilateral knee pain, right shoulder pain, right foot arch fracture. Dr. Celestin completed a Medical Source Statement and opined that plaintiff was moderately restricted in activities requiring fine manipulation and marked restrictions for lifting/carrying heavy objects and long sitting, standing, squatting and kneeling. (T 456).

**James Naughton, D.O.[17]**

On March 10, 2009, plaintiff appeared for an orthopedic evaluation by Dr. Naughton, at the request of the agency. Plaintiff complained of dull, constant pain in his lumbar spine, left hip, both knees, left elbow and right shoulder. (T. 595). Plaintiff stated the pain was 5/10 and worse with lifting. Dr. Naughton noted that plaintiff was in no acute distress but appeared unbalanced when walking heel to toe and favored his left leg. Plaintiff's station was normal, he was slow getting off the examination table but was able to bend his spine, hips and knees to 50 degrees when squatting. Plaintiff's hand and finger dexterity was intact and his grip strength was 5/5 bilaterally. Plaintiff exhibited a full range of motion in both shoulders, forearms, wrists and fingers. Plaintiff's elbow flexion and extension were limited and he displayed positive apprehension in his right shoulder with sensitivity to touch. Plaintiff's lumbar spine extension was 10 degrees, flexion was 75 degrees and lateral flexion was 10 degrees bilaterally. No sciatic notch tenderness or spasm was noted. Plaintiff's straight leg raising on the left was 10 degrees and 90 when sitting and negative on the right. Dr. Naughton diagnosed plaintiff with a history of lumbar spine pain. Dr. Naughton completed a MSS and opined that due to plaintiff's bilateral knee, left hip and left elbow fracture status post surgical repair, he was restricted from activities

---

[17] D.O. is an abbreviation for Doctor of Osteopathy. *Dorland's* at 2140. Osteopathy is any disease of a bone. *Id*. at 1368

that required mild to greater exertion in terms of pushing, pulling, reaching, lifting, carrying and handling objects. Dr. Naughton also concluded that plaintiff was moderately limited to walking and climbing stairs and standing. Dr. Naughton noted that plaintiff had no limitation in sitting. (T. 598).

**Donald Goldman, M.D.**

The ALJ asked Dr. Donald Goldman, a specialist in the field of orthopedics, to review plaintiff's medical records and provide an opinion with regard to plaintiff's ability to perform work-related functions. (T. 71-72).

On February 3, 2011, Dr. Goldman completed a document entitled Medical Interrogatory Physical Impairment(s) - Adults. (T. 693). Dr. Goldman noted that plaintiff "can work with restrictions" and further, that plaintiff's range of motion in his lumbar spine "changes - depending on who is examining". Dr. Goldman summarized plaintiff's orthopedic examinations as follows: "no motor deficits; no atrophy, no weakness, no DTR changes" in lower extremities. (T. 694). Throughout the questionnaire, Dr. Goldman writes, "He can work!" and claims his opinions are supported by CT scans and clinical examinations. (T. 695). Dr. Goldman opined that plaintiff can stand and walk four hours per day; sit for six hours per day; lift/carry 15 to 20 pounds frequently; lift and carry 25 to 30 pounds occasionally; occasionally climb stairs, push, pull and stoop. (T. 696).

On July 2011, Dr. Goldman appeared at an administrative hearing to be questioned by the ALJ and plaintiff's counsel regarding his opinion. Dr. Goldman testified that his opinion was based on the assumption that plaintiff was in pain, but that the pain was not severe because it was not supported by good clinical information. (T. 34). Dr. Goldman opined that plaintiff's doctors diagnosed plaintiff based upon his symptomatic complaints and claims that he had leg pain and

weakness.  Dr. Goldman noted that from 2003 until 2008, plaintiff worked and therefore, that he must have some strength in his leg to be able to walk.  Dr. Goldman concluded that plaintiff's "sudden pain" was unexplained and that none of plaintiff's treating physicians took measurements of his thigh to determine atrophy.  Dr. Goldman agreed that plaintiff was "restricted" but that he could work.  (T. 37).  Dr. Goldman was highly suspicious of the opinions of plaintiff's providers because none of the physicians or physicians' assistants specialized in orthopedics.

**Irwin Rosenberg, M.D.**

At the request of plaintiff's counsel, on June 24, 2011, Dr. Rosenberg examined plaintiff and reviewed his medical records.  On July 6, 2011, Dr. Rosenberg, a board certified orthopedic surgeon, answered questions about his examination and record review during a deposition conducted by plaintiff's counsel.  (T. 829).  On examination, plaintiff ambulated slowly, walked with a stiff gait and could not squat to tie his shoes.  Plaintiff exhibited a decreased range of motion in his back and swelling in his knee.  Dr. Rosenberg opined that plaintiff could stand for two hours in an eight hour workday with the option to stand/sit; could sit for two to four hours with the same option and could lift up to five pounds repetitively.  Dr. Rosenberg concluded that plaintiff would need more frequent breaks than what is standard and that he could not bend, kneel or squat.  Dr. Rosenberg believed that plaintiff would be absent from work three times or more during a month. (T. 837-842).  Dr. Rosenberg stated that his opinion was consistent with plaintiff's medical records.

**DISCUSSION**

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal citations omitted).

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also Shaw*, 221 F.3d at 131.  Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  The Court may also set aside the Commissioner's decision when it is based upon legal error.  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

The ALJ found at step one that plaintiff has not engaged in substantial gainful activity since December 2, 2008 (T. 121).  At step two, the ALJ concluded that plaintiff suffered from the following severe impairments: degenerative disc disease of the lumbar spine and residuals from a motorcycle accident in 2003.  (T. 121).  At step three, the ALJ determined that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in the Listing of Impairments.  The ALJ then found the plaintiff had the

Residual Functional Capacity ("RFC") to "lift/carry 20 pounds occasionally and 10 pounds frequently, sit for 6 hours in an 8 hour workday, stand/walk for 6 hours in an 8 hour workday and can occasionally engage in postural activities. This is consistent with the ability to perform the full range of light work. The claimant has failed to satisfy the burden of establishing that he has any significant on his mental residual functional capacity". (T. 130). At step four, the ALJ concluded that plaintiff was capable of performing his past relevant work as a fast food restaurant shift manager. (T. 140). Therefore, the ALJ concluded that plaintiff was not under disability as defined by the Act.

In seeking federal judicial review of the Commissioner's decision, plaintiff alleges that: (1) the ALJ precluded plaintiff's counsel from cross examining the medical expert; (2) the ALJ improperly assigned significant weight to the opinions expressed by Dr. Donald Goldman; (3) the ALJ erred when he refused to assign any weight to plaintiff's treating sources; and (4) the ALJ failed to consider plaintiff's absenteeism, need for rest and diminished work pace in the RFC analysis. (Dkt. No. 13).

## I.     ALJ'S RELIANCE UPON THE TESTIMONY/OPINIONS OF DONALD GOLDMAN, M.D.

Plaintiff's brief in support of remand centers upon the argument that the ALJ erroneously relied upon the opinions expressed by Donald Goldman, M.D. Specifically, plaintiff claims that the ALJ precluded plaintiff's counsel from questioning Dr. Goldman and further, that the ALJ improperly assigned controlling weight to Dr. Goldman's opinions.

An administrative law judge has discretion as to when it is necessary to call a medical expert on the nature and severity of a claimant's impairments. See 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii). "[A]n ALJ is entitled to rely upon the opinions of both examining and

non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability." *Baszto v. Astrue*, 700 F.Supp.2d 242, 249 (N.D.N.Y. 2010).

### A. Dr. Goldman's Testimony

Plaintiff claims that his counsel was precluded from properly cross examining the medical expert. Specifically, plaintiff alleges that the medical expert questioned plaintiff without counsel's consent and further, that the ALJ did not advise plaintiff's counsel that the expert had another engagement.

The administrative hearing was approximately one hour and six minutes in duration. During that time, the ALJ posed questions to the expert, the expert posed questions to plaintiff's counsel and to plaintiff directly and plaintiff's counsel questioned the expert. At the beginning of the hearing, the expert acknowledged that he received additional materials from plaintiff's counsel. The ALJ asked whether his responses to the interrogatories changed based upon his review of the recently received materials. The expert responded:

> A. Well, I would have to say no, Your Honor, but, in addition, I would have to say I would have to ask a couple of questions, because there are some additional issues that have come up that, if there were clarified, I may or may not change my decision.
>
> ALJ: All right. Let me hold you in abeyance one second. Mr. Gorton, any objection to him inquiring?
>
> ATTY: None.
>
> ALJ: Are the questions of the Claimant or of Mr. Gorton, the attorney?
>
> ME: I would have just a couple of questions, Your Honor.
>
> ALJ: For who?
>
> ME: Either one. It doesn't make a difference if - - - (T. 18).

Plaintiff was sworn in and the ALJ advised, "Dr. Goldman, you are free at this point to inquire of either Mr. Gorton, the attorney or Mr. Harrison, the Claimant". Plaintiff's counsel did not voice any objection.

Later during the hearing, the doctor advised that he was under time constraints:

> ME: Yeah. I, I, I'm sorry to also say, Your Honor, I'm also pressed for time.
>
> ALJ: All right. Let me ask Mr. Gorton, now that he tells you he's pressed for time, I suppose you want to go on forever? Can you spare 10 minutes, Doctor?
>
> ATTY: Well - -
>
> ME: I can spare about four or five, Your Honor.
>
> ALJ: All right. Mr. Gorton? Inasmuch as this is the third attempt to try this cross-examination, or second attempt, and you were the one who wanted to add the late information, I'm afraid you're the one that's going to have to make do.
>
> ATTY: All right. I'll, I'll, I'll, I'll question until you tell me I have to stop. (T. 52).

When the doctor advised that he had to leave, plaintiff's attorney responded, "Okay" and expressed no objection. (T. 55).

On July 22, 2011, plaintiff's counsel forwarded a letter to the ALJ summarizing plaintiff's position. In that correspondence, counsel noted:

> As an initial matter, unfortunately because the doctor was not called until approximately 40 minutes after the start of the hearing, because the doctor was given approximately 20 minutes at the inception of the hearing to question Mr. Harrison (without our permission) and because our questions were often interrupted by the Courts rehabilitation of the doctors [sic] answers, we actually only had about 20 minutes to question the physician and were not even close to being completed. (T. 380).

In the letter, counsel outlines the additional issues that he would have addressed with the doctor but, at no point in the letter, did counsel ask for a supplemental hearing to examine Dr. Goldman nor did counsel cite to any relevant caselaw in support of his position. Plaintiff's

18

counsel also alleged, in the letter, that Mr. Harrison was questioned by the medical expert "without our permission".

In the decision, the ALJ notes:

> . . . the lack of clarity in the medical records was the reason Dr. Goldman inquired of counsel whether he could ask clarifying questions of the claimant. That triggered my specific inquiry of counsel to determine whether he had any objection to the expert witness' questions of the claimant. Attorney Gorton stated, in complete contravention of his post hearing assertions clearly, and on the record, that he had "no objection" to Dr. Goldman questioning the claimant. Only then, was the claimant sworn and Dr. Goldman allowed to ask questions to which the claimant, in some cases, with the assistance of counsel, answered. (T. 137).

The Court has reviewed the transcripts from all three administrative hearings. During the July 2011 hearing, counsel clearly did not object to the medical expert questioning plaintiff at any time during the hearing. While it is clear, from the transcript and post-hearing record that the ALJ was aware that the expert's time was limited due to his scheduled appearance and participation in the Wounded Warrior Program, the Court cannot form an opinion as to whether the ALJ ever advised plaintiff's counsel of the expert's time constraints. However, even assuming that the ALJ failed to inform plaintiff's counsel's of the conflict in a timely manner, that error does not warrant remand. Regardless of whether the ALJ advised plaintiff's counsel that the doctor was under time constraints, plaintiff's counsel never objected to the termination of the examination and never asked, on the record, for additional time to question the doctor. Further, after the hearing was closed, counsel had two opportunities to request a supplemental hearing or to object to the manner in which the ALJ conducted the hearing: in his post-hearing brief and in his request for review by the Appeals counsel. Counsel failed to do so. The Court cannot review an issue that plaintiff could have raised on administrative appeal, but failed to do. *Fernandez v.*

*Apfel*, 1998 WL 603151, at *16 (S.D.N.Y. 1998).  In addition, the Commissioner asserts, with substantial evidence to support, that Dr. Goldman was available to testify on April 20, 2011 but was unable to do so because he was not in possession of supplemental records that plaintiff's counsel failed to provide in a timely manner.  (T. 140).  Plaintiff did not object to that adjournment.

Based upon the evidence and record, the Court finds that the ALJ provided plaintiff's counsel with ample opportunity to cross-examine Dr. Goldman and further, that the ALJ's conduct during the hearing did not impede or restrict plaintiff's questioning.  Counsel clearly did not object to questions being posed to his client and any objection, at this time, is not properly before this Court.  There is no basis for remand on this issue.

### B.    Weight Assigned to Dr. Goldman's Opinion

Plaintiff also argues that the ALJ erred when he assigned great weight to Dr. Goldman's opinion because the doctor's conclusions were based upon incorrect information.  Specifically, plaintiff notes that Dr. Goldman believed there were no range of motion tests; blood work and no atrophy.

The ALJ's decision is twenty-four pages in length. The ALJ mentions Dr. Goldman several times in every step of the sequential analysis.  At step two of the analysis, the ALJ gave Dr. Goldman's opinion "considerable weight" when he determined that plaintiff did not suffer from post traumatic arthritis.[18]  (T. 123).  The ALJ also discussed the "dearth" of objective medical evidence, especially diagnostic testing, and noted that it confirmed Dr. Goldman's testimony that there was no evidence substantiating or corroborating plaintiff's increased

---

[18] Plaintiff does not object to this determination at Step Two of the evaluation.

symptoms over time. (T. 123). The ALJ also discussed the "progressive element" to plaintiff's injuries and concluded:

> While Dr. Goldman acknowledged that progression could happen, he maintained his position and expert opinion that, in this specific case, there was essentially no medical evidence from diagnostic imaging or from the clinical findings to substantiate profession in the claimant's underlying medical condition that supports claimant's allegations of increased or worsening symptoms. (T. 124).

The ALJ acknowledged the atrophy issue. During the hearing, plaintiff's counsel argued that the doctor missed evidence of atrophy. The ALJ addressed that error:

> Dr. Goldman's testimony was that atrophy might be a significant sign of an orthopedic problem but that other factors also need to be taken into account. In this case, Dr. Goldman noted that the claimant had returned to work after 2003 and worked for a period of years, which he believes is a clear indication that the claimant had largely recovered from his injuries and that the claimant had increased his functioning and conditioning. In stark contrast, to this single finding of atrophy are multiple findings of no atrophy. Based on the doctor's nuanced testimony, I cannot accept Attorney Gorton's argument that Dr. Goldman's testimony is, in any way, deficient because he failed to cite a 3 cm difference in thigh measurements. In addition, the significance of the 3 cm (which converts to 1.18 inches) difference is not made clear in the record. I note also that Xiao Fang, M.D., a pain clinic doctor who initially saw the claimant in October 2009, likewise, observes no atrophy. (T. 125).

The ALJ also discussed Dr. Goldman's specific opinion regarding plaintiff's ability to work and the basis for that opinion. The ALJ noted that Dr. Goldman "assumed the claimant had some pain from an orthopedic point of view even though there was not a lot of 'good' clinical evidence to support any pain claims". (T. 137). The ALJ cited to Dr. Goldman's reliance upon the claimant's return to work following the 2003 motor vehicle accident and continued work over a period of years. (T. 138). The ALJ also acknowledged Dr. Goldman's belief that plaintiff "was

being treated symptomatically" and suggested that "none of the claimant's doctors performed an adequate evaluation of the claimant".

Finally, the ALJ assigned "great weight" to Dr. Goldman's testimony and responses to interrogatories, "[b]ecause of his expertise":

> Dr. Goldman's testimony was specific, direct, clear, and well supported by his references to the evidence of record. Dr. Goldman relied, as he should, on the medical evidence of record to support his testimony. I requested the involvement of this specialized medical expert because my review of the medical evidence failed to locate good longitudinal clinical or objective findings to support the nature and extent of the claimant's allegations or the opinions of some of his doctors. (T. 138).

> Dr. Goldman's testimony, including his responses to interrogatories, constitutes significant evidence contradicting the opinions and assessments of the various treating and nontreating sources of record. I find both credible and persuasive, Dr. Goldman's testimony that the claimant is being treated symptomatically even by specialists such as Drs. Oven and Fang. I concur with Dr. Goldman's observation and opinion that the clinical findings of record are, at best, minimal and inadequate from an orthopedic point of view and, accept his professional observation that "post traumatic arthritis" is just a general phrase that has little medical meaning". (T.1 39).

Plaintiff claims that the holding in *Dommes v. Colvin*, 2014 WL 318242 (N.D.N.Y. 2014) supports his position. In *Dommes*, the ALJ found that the plaintiff suffered from a herniated nucleus pulposus in her lumbar spine with an annual tear. Plaintiff treated with Dr. Fang and underwent various MRI studies. Dr. Fang concluded that plaintiff's lifting was limited to five pounds and needed to cut down her work hours from normal, eight hour days to 13 hours per week. *Id*. at *3. Despite that opinion, the ALJ found that plaintiff was capable of performing her past relevant work as a document and imaging processor. *Id*. at *2. Dr. Goldman testified, via telephone, at a rehearing and at the request of the ALJ. Dr. Goldman opined that the plaintiff's symptoms did not meet or equal a medical impairment. *Id*. at *4. Dr. Goldman concluded that

plaintiff could work with some limitation and suggested that Dr. Fang's conclusions were based on symptomatic assessments. *Dommes*, at 2014 WL 318242, at *4.   The plaintiff challenged the ALJ's findings with respect to Dr. Goldman.   The Court noted that Dr. Goldman, "acknowledged that [the] [p]laintiff's impairments could limit her lifting ability to five pounds, could cause pain, and could affect concentration and limit work pace". *Id*. at *7.   The Court further found, "[t]he ALJ does not assert that the diagnostic techniques used by the treating physicians were not medically accepted, nor is there substantial evidence to support such a conclusion". *Id*.   The Court took exception to the ALJ's treatment of the plaintiff's treating physicians noting, "most of [the] [p]laintiff's treating physicians saw her on multiple occasions" and that the physicians were, "knowledgeable about [the] [p]laintiff's impairments because they were specialists in their respective fields of medicine, and treated [the] [p]laintiff for the aspects of her condition for which they were most qualified according to their specialties". *Id*.   The Court also found that the treating physicians opinions were generally consistent with the medical evidence.  *Dommes*, 2014 WL 318242, at *7.

The medical evidence in the matter at hand is readily distinguishable from the facts before the Court in the *Dommes* case. Thus, the Court is not compelled to follow nor persuaded that the holding in *Dommes* applies to Dr. Goldman's opinions herein.   The Court will discuss the opinions of plaintiff's treating sources, in depth, further in this decision.   However, to summarize, the record herein does not contain any diagnostic imaging or objective medical testing supporting the restrictive opinions of plaintiff's treating providers.   In addition, plaintiff relies upon the opinions expressed by Drs. Oven and Fang, both of whom are not experts in the field of orthopedics and had limited contact with plaintiff.   To wit, Dr. Fang examined plaintiff four times

and the majority of plaintiff's treatment at Regional Rheumatology was with the physicians' assistant.

The Court is persuaded by the holding in a more recent case in this district, *Beasock v. Colvin*, 2014 WL 421324 (N.D.N.Y. 2014). In *Beasock*, Dr. Goldman was called as a consulting orthopedic physician to review the plaintiff's medical record and answer post-hearing interrogatories. Dr. Goldman opined that the plaintiff could sit for six hours in an eight hour workday, stand/walk for four hours and lift/carry ten pounds. *Id*. at *2. The ALJ rejected more restrictive opinions offered from two of the plaintiff's treating physicians in favor of Dr. Goldman's assessment. The ALJ afforded "great weight" to Dr. Goldman's opinion noting that, "he has a specialty in the field in which the claimant's impairments lie and his conclusions are in accord with the medical evidence of record". *Id.* at *7. On appeal, the plaintiff argued that the ALJ erred in affording great weight to Dr. Goldman's assessment while rejecting the opinions of the plaintiff's treating physicians who had significantly more contact with the plaintiff. *Id*. The Court disagreed and held that the evidence did not support the opinions offered by the plaintiff's physicians whose opinions consisted, "mainly of check-the-box responses on a medical assessment form, and otherwise terse and unamplified answers". *Beasock*, 2014 WL 421324, at *9. Moreover, the Court found that the physicians offered opinions inconsistent with the record as a whole and with the limitations set forth in their own medical assessments. *Id*. The Court held that the ALJ did not err in giving Dr. Goldman's opinions great weight because the opinions were consistent with the evidence as a whole and further acknowledged Dr. Goldman as a specialist in orthopedic impairments. *Id*.

Based upon the medical record in the case at hand, the Court is persuaded by the reasoning of *Beasock*. Dr. Goldman is a specialist in orthopedic impairments. The medical opinions

provided by plaintiff's treating sources are based upon a diagnosis of degenerative disc disease of the lumbar spine and were rendered by physicians' assistants, rheumotoglists and pain management specialists, not by any orthopedist.[19]  Plaintiff has failed to present any opinion regarding his functional impairments and his ability to do work related activities from any orthopedic specialist.  Indeed, while plaintiff was treated at Tier Orthopedics, the record contains notes from only two visits.  During those visits, the physicians' assistant noted plaintiff was not compliant with the suggested course of treatment, i.e. physical therapy.  In addition, there are few objective, radiological tests supporting the restrictive opinions expressed by plaintiff's providers. Indeed, the films that were taken are largely negative and depicted no abnormalities.  Finally, as in *Beasock*, the medical assessments provided by Oven, D'Angelo and Fang are "check-in the box" forms that contain few written comments or explanations from the providers.

Accordingly, the Court finds that the ALJ's decision to assign "great weight" to the opinions expressed by Dr. Goldman is supported by the substantial, objective medical evidence and thus, declines to remand this matter on this issue.

## II.    TREATING PHYSICIAN RULE

Having found that the ALJ did not err when he assigned "great weight" to Dr. Goldman's opinions, the Court addresses plaintiff's allegations with respect to the treating physician rule. Plaintiff argues that the ALJ failed to follow the treating physician rule with respect to the opinions expressed by Dr. Oven, P.A D'Angelo, P.A. Brunt and Dr. Fang.[20] Initially, the Court is compelled to address the inadequacies of plaintiff's Memorandum of Law and arguments.

---

[19] The details regarding the assessments provided by the treating physicians and physicians' assistants are discussed *infra*.

[20] The Court notes that the record contains treatment records from other physicians and reports from other consultative examiners.  However, plaintiff has confined his argument to the aforementioned physicians.  Thus, the Court will not review the ALJ's findings with respect to the remaining sources.

Cohesive arguments, attention to detail and appropriate citations are always required. Plaintiff provides the Court with a summary of the weight assigned by the ALJ to the relevant providers. Plaintiff, however, has not offered any rationale, beyond conclusory allegations, to support his argument that the ALJ erred because he "[gave] no discernible weight to any of the other opinions with respect to exertional requirements". (Dkt. No. 13, p. 17).

The Second Circuit has defined a treating physician as one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Coty v. Sullivan*, 793 F.Supp. 83, 85 86 (S.D.N.Y.1992) (quoting *Schisler v. Bowen*, 851 F.2d 43 (2d Cir.1988)). Under the Regulations, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Rosa*, 168 F.3d at 78 79; *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir.1993). When an ALJ refuses to assign a treating physician's opinion controlling weight, he must consider a number of factors to determine the appropriate weight to assign, including:

> (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

20 C.F.R. § 404.1527(d)(2). The Regulations also specify that the Commissioner "will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir.2004)

(citing 20 C.F.R. § 404.1527(d)(2)); *see also Schaal v. Apfel*, 134 F.3d 501, 503 504 (2d Cir.1998).

The opinion of a treating physician is not afforded controlling weight where the treating physician's opinion contradicts other substantial evidence in the record, such as the opinions of other medical experts. *See Williams v. Comm'r of Soc. Sec.*, 236 F. App'x 641, 643-44 (2d Cir. 2007); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citing 20 C.F.R. § 404.1527(d)(2)). "While the final responsibility for deciding issues relating to disability is reserved to the Commissioner, the ALJ must still give controlling weight to a treating physician's opinion on the nature and severity of a plaintiff's impairment when the opinion is not inconsistent with substantial evidence. *See Martin v. Astrue*, 337 F. App'x 87, 89 (2d Cir. 2009).

### 1. Joseph Brunt, P.A.

At Step Two of the sequential analysis, the ALJ discussed P.A. Brunt's clinical findings and concluded, "[o]n those few occasions when PA Brunt did indicate some upper extremity range of motion limitations, I think it significant that he failed to specify either the nature or the extent of these limitation". (T. 124). The ALJ gave little weight to Brunt's opinions noting that his opinions were inconsistent with the medical evidence of record. The ALJ discussed Brunt's opinion in his RFC assessment and found:

> I have given little weight to the opinion of P.A. Brunt because it also is inconsistent with the medical evidence of record. While his treatment notes show some range of motion limitations of the lumbar spine and some joints, other examinations of the same patient, the claimant, show no limitations on range of motion. PA Brunt does not delineate the degree of the limitations such that his opinion is unsupported. A close reading of PA Brunt's treatment notes document that PA Brunt's clinical findings are, at best, cursory. For example, he writes in several treatment notes that the claimant has "limited active and passive range of motion of the lumbar spine secondary to pain". Such a finding does not readily translate to the extreme limitations

identified by PA Brunt including the limitation that the claimant cannot lift any significant weight whatsoever. This type of extreme limitation is simply unreasonable in that it would meant the claimant should be bedridden and would require 24-hour care, neither of which is true here. (T. 135).

The ALJ was not required to apply the treating physician rule to the opinions expressed by P.A. Brunt. A physician assistant is defined as an "[o]ther source" whose opinion may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight. 20 C.F.R. § 416.913(d)(1). The November 2010 opinion expressed by P.A. Brunt is, for the most part, illegible and contains cursory notations including a vague diagnosis of "multiple fractures with motorcycle accident". (T. 645). As stated *supra*, P.A. Brunt's opinion is expressed on a pre-printed form that required Brunt to simply check boxes. Moreover, the opinion is not supported by substantial evidence including P.A. Brunt's treatment notes. P.A. Brunt's notes from the two year period of treatment consistently note that plaintiff exhibited a "full range of motion". At times, plaintiff's range of motion was described as "limited" without any explanation of where or how much limitation was exhibited. Of importance, the November 2010 examination (the most recent examination and contemporaneous to the completion of the Questionnaire), P.A. Brunt noted that plaintiff exhibited a full range of motion and was in no acute distress. P.A. Brunt's opinion is also contradicted by diagnostic films ordered by P.A. Brunt himself. In November 2008, P.A. Brunt ordered x-rays of plaintiff's lumbar spine and left knee. The films failed to reveal any objective finding that would support the restrictive limitations expressed in P.A. Brunt's opinion. Moreover, P.A. Brunt failed to address those films or the impressions in any notes or in his opinion. Upon review of the entire record, the Court finds that the ALJ was not required to apply the treating physician rule to P.A. Brunt's

opinion but rather, the ALJ properly considered P.A. Brunt's opinions and provided adequate reasons for refusing to assign controlling weight to his conclusions.

**2.    Aspen L. D'Angelo, P.A. and Thomas J. Oven, M.D.**

Plaintiff summarily argues that the ALJ erroneously assigned "no weight" to P.A. D'Angelo's opinions and Dr. Oven's opinions. Plaintiff does not provide any analysis or citations to the medical record in support of this assertion.

The "Questionnaire" was signed by P.A. D'Angelo and Dr. Oven. Courts have held that even if a doctor did not write the report, if the doctor signs the report, it should be treated as a treating source under the treating physician rule, unless there is evidence that the report does not reflect the doctor's views. *Khan v. Astrue,* 2013 WL 3938242, at *18, n. 15 (E.D.N.Y. 2013).

In the RFC assessment, the ALJ summarized P.A. D'Angelo and Dr. Oven's March 31, 2010 opinion and April 15, 2011 addendum and concluded:

> I have, [. . .], given little weight to the opinions of Dr. Oven and P.A. D'Angelo because they are not consistent with the medical evidence of record. In fact, their own treatment notes generally show no evidence of an inflammatory process such as joint swelling, edema or redness. They do, however, show good range of motion of the shoulders, knees, ankles and hips, some tenderness of the low back area, no neurological deficits of the lower extremities, left knee flexion to beyond 100 degrees and no range of motion limitations of the right knee. Their own findings do not support their assessments. Their assessments are extreme and suggest that the claimant is not able at all to function independently. The claimant at least cares for his own personal grooming needs and does usual activities to maintain his household, all in contradiction to these assessments. While Dr. Oven found a bony abnormality of the left elbow, PA Brunt indicates that there is no bony deformity. As noted in Finding of Fact #3, Dr. Goldman testified that the diagnosis of posttraumatic osteoarthritis is but a general phase and is used when the medical provider does not really know what the underlying problem is. Also, and as discussed in Fact Finding #3, diagnostic imaging of the claimant's left knee and left hip do not reveal arthritis and there has been no imaging of the left elbow since the 2003 motor vehicle accident. As a result, Dr. Oven

and P.A. D'Angelo's opinions are wholly unsupported when they cite posttraumatic osteoarthritis as the claimant's underlying medical problem in the attempt to justify their assessments.[21] (T. 134-135).

Upon review of the evidence, the Court finds that the ALJ's decision to assign "little weight" to P.A. D'Angelo's and Oven's opinions is supported by substantial evidence and adequate reasoning. The extreme restrictions contained in the opinion are not supported by P.A. D'Angelo's or Dr. Oven's clinical records. Both P.A. D'Angelo and Dr. Oven continually noted that plaintiff's knees, hips and ankles "moved well". The office records are devoid of any reference to plaintiff's restrictions on lifting, sitting or standing. Moreover, there are no notations regarding the need for plaintiff to rest frequently or possible absenteeism. To the extent the opinions differed with the medical record, indicating restrictions that were far more severe than those which would be supported by the record evidence, such as marked limitations for lifting and carrying or an opinion that plaintiffs' medical condition would result in a substantial number of absences from work, the opinions were properly discredited. "When other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling." *See Snell v, Apfel*, 177 F.3d 128, 133 (2d Cir. 1999). Moreover, in June 2009 (eight months prior to the date the Questionnaire was completed), plaintiff advised Dr. Oven that he was working on his home and "putting siding up". The answers to the Questionnaire were based upon an examination that allegedly occurred approximately four months prior, however, there is no evidence of that examination in the record.

---

[21] The ALJ previously discussed P.A. D'Angelo and Dr. Oven's records during Step Two of the sequential analysis and gave "little weight to any assertions in the record that the claimant has an inflammatory process such as rheumatoid arthritis". (T. 123). Plaintiff does not challenge the ALJ's determination with regard to his arthritis at Step Two of the analysis.

The Court also finds that P.A. D'Angelo and Dr. Oven's restrictive opinions regarding plaintiff's work-related abilities are not supported by objective medical evidence including x-rays and CT scans. In November 2008, x-rays of plaintiff's lumbar spine revealed mild wedge compression deformities but an otherwise "negative study". (T. 239). In January 2009, plaintiff's CT scans of his lumbar and thoracic spine revealed. On August 5, 2009, plaintiff appeared for seven x-rays of his lumbar spine. The studies revealed a minor lumbar levoscoliosis, mild disc space narrowing at L5-S1; no definite abnormal mobility seen during flexion/extension. (T. 387). The ALJ noted the results of these studies in his decision.

Although Dr. Oven was a treating physician, the objective medical evidence and evidence from other physicians does not support such extensive limitations. *Dumas v. Comm'r of Soc. Sec.*, 2008 WL 4104685, at *4 (E.D.N.Y. 2008) (holding that the ALJ did not err in refusing to give great weight to the opinions of the plaintiff's treating physicians because their opinions indicated that the plaintiff's abilities were much more limited and restricted than the opinions of other medical consultants and inconsistent with bulk of the plaintiff's medical records). The ALJ must weigh the evidence of record and resolve genuine conflicts and inconsistencies therein. *Veino*, 312 F.3d at 588.

### 3. Xiao Fang, M.D.

The ALJ addressed Dr. Fang's opinions in his RFC assessment. The ALJ reiterated Dr. Fang's March 2010 opinion and assigned "little weight" to Dr. Fang's assessments finding:

> They are not consistent with the reliable medical evidence. A review of Dr. Fang's own treatment notes reveals that he generally found the claimant to have range of motion limitations of the lumbar spine and tenderness of the low back, but was without neurological deficits or strength deficits and had full ranges of motion of the hips, knees and ankles and no muscle atrophy. I note that the referral to Dr. Fang was made due to the claimant's lumbar spine complaints and not for

complaints related to the residuals of the 2003 motorcycle accident. In that regard, the medical evidence shows only mild degenerative changes at L4-L5 and L5-S1 and healed compression fractures. Dr. Goldman's testimony emphasizes the "mild" nature of the degenerative changes while PA Harris at Tier Orthopedic Associates confirmed this by observing that the healed compression fractures are "just not grossly abnormal". The minimal findings on diagnostic imaging do not support Dr. Fang's assessments. (T. 134).

Although deference should normally be accorded to Dr. Fang's opinion because he is plaintiff's treating physician, Dr. Fang's March 2010 opinion is not supported by any recent examination suggesting that such deference would be appropriate. *Ruggireo v. Astrue*, 2008 WL 4518905, at *13 (N.D.N.Y. 2008). The answers to the March 2010 Questionnaire were allegedly based upon an examination that occurred in February 2010. However, there is no evidence of that visit in the record. An opinion that is not supported by a contemporaneous physical examination is not entitled to controlling weight. *See Batchelder v. Astrue*, 2011 WL 6739511, at *9 (N.D.N.Y. 2011). Rather, the first record of any physical examination by Dr. Fang is September 2010, six months after the Questionnaire was completed. While plaintiff was examined at the Center for Pain Relief prior to March 2010, he was not examined by Dr. Fang. In October 2009, November 2009 and December 2009, plaintiff was examined by and treated with Dr. David Kammerman, another physician at the Center for Pain Relief. Dr. Fang does not reference those records in his Questionnaire and there is no opinion in the record from Dr. Kammerman. Further, Dr. Kammerman's most recent examination pre-dates the March 2010 Questionnaire by three months. The cursory nature of Dr. Fang's opinion/restrictions further undermines his assessment. Similar to the opinions expressed by Brunt, Dr. Fang merely checked boxes on a preprinted form and under diagnosis, the doctor simply noted "lumbar spondylosis". (T. 616).

Dr. Fang's opinions regarding plaintiff's limitations are clearly not supported by Dr. Fang's clinical findings or treatment notes. Dr. Fang's treatment notes are extremely brief and contain nothing more than cursory conclusions unsupported by objective testing. *See Alvarado v. Barnhart*, 432 F.Supp.2d 312, 321 (W.D.N.Y. 2006) (internal citation omitted) (holding that the treating physician's opinions must be discounted as they were too brief and conclusory and wholly unsupported by any medical evidence, treatment notes, specific findings, or clinical). Dr. Fang does not reference any objective, diagnostic testing and never ordered any films of any portion of plaintiff's body.

For the foregoing reasons, the Court finds that the ALJ complied with regulations and applied the treating physician rule. The ALJ assigned appropriate weight to the opinions of the aforementioned physicians and adequately explained his reasoning.

## II.     CONSULTATIVE EXAMINERS

Plaintiff claims that the ALJ erred when he assigned only "minimal" and "some" weight to the opinions of the defendant's medical examiners, Dr. Celestin and Dr. Naughton. Plaintiff also attempts to formulate an argument with respect to the ALJ's treatment of Dr. Rosenberg's evaluation.

The treating physician rule does not apply to consulting doctors. *See Jones v. Shalala*, 900 F.Supp. 663, 669 (S.D.N.Y. 1995); *see also Limpert v. Apfel*, 1998 WL 812569, at *6 (E.D.N.Y.1998). The weight afforded a consultative opinion depends upon the thoroughness of the underlying medical examination and the degree of light the opinion sheds on the conflicting assessment of the treating physician. *Gray v. Astrue*, 2009 WL 790942, at *10  11 (N.D.N.Y.2009) (citation omitted). While an ALJ must give "good reasons" if he does not give a

treating physician's opinion sufficient weight, there is no similar requirement for consulting

physicians. *Id*. (citing *Limpert*, 1998 WL 812569, at *6).

### A.     Dr. Celestin

The ALJ discussed Dr. Celestin's opinion at Step Two of the sequential analysis and again

during his assessment of plaintiff's RFC.  At Step Two, the ALJ acknowledged plaintiff's reliance

upon Dr. Celestin's December 16, 2009 report and discussed her clinical findings.  The ALJ

concluded:

> I give very little weight to Dr. Celestin's examination findings because
> they represent those of, using the vernacular, an outlier.  The doctor's
> late dated, and extreme findings are neither supported nor reported
> anywhere else in the claimant's medical evidence.   What these
> reported findings do give rise to however, is the issue of claimant's
> credibility and veracity.

The ALJ provided examples from plaintiff's neurologist, Dr. Bajwa, who noted that

plaintiff walked without acute distress or limp and that his range of motion was only mildly

restricted.  The ALJ also discussed P.A. Brunt's various notes that documented full active and

passive ranges of motion of the lumbar spine with some tenderness and full ranges of motion of

all extremities with some tenderness.  The ALJ found:

> In short, individual reports or treatment notes should not be read in
> isolation, especially in a case where as here, there are multiple treating
> sources that regularly see the claimant and document those findings.
> Based on the foregoing, I find Dr. Celestin's report unreliable and
> Attorney Groton's heavy reliance upon it as misguided because it
> attempts to create an unbalanced picture of the overall medical
> evidence of record. (T. 126).

As part of the RFC assessment, the ALJ reiterated:

> Although Attorney Groton cites this opinion as support for the
> claimant's case, this opinion is less restrictive than he things as the
> marked limitations are on lifting heavy objects and sitting, standing
> and walking for long periods.  In any event, as discussed in Finding of

Fact #3, Dr. Celestin's physical examination must be treated as an outlier when read in the context of the medical evidence of record as a whole, such that her opinion is entitled to only minimal weight. In addition, while Dr. Celestin cites a limitation on fine manipulation, her own examination of the claimant found intact hand/finger dexterity and 5/5 grip strength bilaterally. Other examinations of record confirm that the claimant has no limitations on his fine manipulation abilities. (T. 135).

Plaintiff notes that Dr. Celestin's opined that, "James could not do the full range of sedentary work" but concedes that Dr. Celestin made "no comment specifically but not[ed] marked limitation even to sitting, and moderate limitations to use of hands". (Dkt. No. 13, p. 7, 18). "While the opinions of treating or consulting physicians need not be reduced to any particular formula, the consultative examiner's use of the term "moderate", without additional information, does not permit the ALJ, to make the necessary inference that [plaintiff] can perform the exertional requirements". *Karabinas v. Colvin,* 2014 WL 1600455, at *11 (W.D.N.Y. 2014) (citations omitted). Here, Dr. Celestin's opinion regarding plaintiff's ability to sit and use his hands lacks the requisite specificity and precludes the ALJ from drawing the conclusions or inferences plaintiff seeks. *See Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (holding that consulting physicians opinion that the plaintiff's impairment was "lifting and carrying moderate; standing and walking, pushing and pulling and sitting mild" lacked specificity and did not permit the ALJ to make the necessary inference that the plaintiff could perform the exertional requirements of sedentary work). Dr. Celestin's vague statements do not provide the ALJ with sufficient information to formulate an RFC that is supported by substantial evidence. Plaintiff has not cited to any medical evidence that supports Dr. Celestin's restrictive analysis. Thus, the ALJ's decision to assign minimal weight to the doctor's opinion is not reversible error.

**B.     Dr. Naughton**

The ALJ reiterated Dr. Naughton's assessment and found:

> In light of the record as a whole, I have given some weight to this assessment, which in its specifics would not preclude all work. As with Dr. Celestin's opinion, limitations on find manipulation are not supported by the medical evidence or Dr. Naughton's own examination. (T. 136).

Plaintiff admits that Dr. Naughton made "no specific comment [regarding plaintiff's need for breaks, absenteeism or diminished work pace], but not[ed] that he is restricted from activities requiring even mild exertion". (Dkt. No. 13, p. 17). For the reasons discussed in Part III(A) *supra*, Dr. Naughton's opinion is deficient. Dr. Naughton never explained what a "moderate" limitation was or how that affected the plaintiff's ability to perform work. *See Abbott v. Comm'r of Social Sec.*, 2010 WL 5464797, at *13 (N.D.N.Y. 2010) (Dr. Naughton stated that the plaintiff would have "moderate limitation" walking, climbing stairs, pushing, pulling, and reaching but the doctor never estimated the amount of weight that the plaintiff could lift). Accordingly, the Court finds no error in the ALJ's decision to assign minimal weight to Dr. Naughton's opinion regarding plaintiff's ability to perform work-related activities. *See Ubiles v. Astrue*, 2012 WL 2572772, at *11 (W.D.N.Y. 2012) (Dr. Naughten's vague opinion that the plaintiff had "moderate limitations in standing, walking, climbing stairs, and lifting minor weights" was "entirely too vague" to serve as a proper basis for an RFC).

## C.   Irwin Rosenberg, M.D.

In the "Background" portion of his brief, plaintiff summarizes the opinions expressed by Dr. Irwin Rosenberg but failed to provide any meaningful argument in support of remand based upon Dr. Rosenberg's opinion. However, the Court assumes plaintiff objects to the ALJ's refusal to assign any weight to Dr. Rosenberg's opinion and thus, will address that objection.

The ALJ addressed Dr. Rosenberg's "deposition" and summarized his opinions. The ALJ provided four reasons for assigning "very little weight" to his opinions:

> First, medical expert, Dr. Goldman, after reviewing Dr. Rosenberg's "deposition" noted, and testified, that Dr. Rosenberg's examination was superficial. Specifically, as discussed by Dr. Goldman, it was superficial because Dr. Rosenberg's "examination" failed to include and report any examination or testing for weakness, muscle atrophy, parasthesia, 2-point discrimination and straight leg raising; all of which, as Dr. Goldman testified, is necessary for a full orthopedic examination. Second, Dr. Rosenberg's assessment, given its timing and purpose, may not have been the result of independent medical judgment. Third, Dr. Rosenberg's assessment, which includes marked limitations on lumbar spine flexion, is wholly inconsistent with the medical evidence from claimant's own treating physicians and providers or record. For example, treating PA Brunt found no range of motion issues of the lumbar spine; and likewise, the orthopedic examination by treating RPA Harris does not support Dr. Rosenberg's findings. It was Dr. Goldman's affirmative testimony that Dr. Rosenberg's assessment was not consistent with, nor supported by the overall medical evidence of record. Fourth, Dr. Rosenberg's "absolute certainty" that the claimant has competent producing causes of his pain was specifically refuted by Dr. Goldman, who correctly noted that the claimant's lumbar spine x-ray showed only mild degenerative changes. (T. 136).

The ALJ was not compelled to assign great or controlling weight to Dr. Rosenberg's opinion because Dr. Rosenberg did not provide plaintiff with the type of ongoing medical treatment that would define him as a "treating physician". *See George v. Bowen*, 692 F.Supp. at 215, 219 (S.D.N.Y. 1988) (holding that the nature of the physician's relationship with the plaintiff did not rise to the level of a treating physician as the physician had only seen the plaintiff on two occasions)); *see also Quinones v. Barnhart*, 2006 WL 2136245, at *7 (S.D.N.Y.2006) (holding that the treating physician's opinion was correctly afforded less weight as he only saw the plaintiff on one occasion). The ALJ discussed Dr. Rosenberg's opinion and provided adequate reasons for

failing to assign the opinion controlling or significant weight. The Court finds no basis for remand on this issue.

Similar to reasons set forth in Parts II and III(A) and (B), the ALJ was not required to assign controlling weight to Dr. Rosenberg's opinion. The ALJ rejected this assessment noting that such extreme restrictions were not supported by clinical evidence and that the opinion was based upon a superficial examination. Additionally, since Dr. Rosenberg only examined Snipe on one occasion, his opinion is not entitled to the weight accorded the opinion of a treating physician. *See* 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i); *Snipe v. Barnhart*, 2006 WL 2390277, at *17 (S.D.N.Y. 2006) (collecting cases) (opinion of physician who examines patient once or twice is not entitled to the extra weight of that of a treating physician); *see also Beasock*, 2014 WL 421324, at *9 ("it seems facially arbitrary and illogical to afford 'great weight' to opinions of [a physician] who examined or treated [plaintiff] once").

## II.    RFC

Plaintiff argues that the RFC analysis is flawed because the ALJ failed to consider plaintiff's need for work breaks, absenteeism and significant diminished work pace. (Dkt. No. 13, p. 21). Plaintiff relies upon the opinions expressed by Dr. Oven/P.A. D'Angelo, Dr. Fang and Dr. Rosenberg in support of this argument. Specifically, Dr. Oven/P.A. D'Angelo and Dr. Fang concluded that plaintiff would be absent more than four times per month and suffered a diminished work pace between 20% and 33%. *Id*. at p. 16. Moreover, Rosenberg concluded that plaintiff would be absent from work more than three times per month. *Id*.

As discussed *supra*, the ALJ correctly assigned minimal weight to the opinions expressed by Dr. Oven/P.A. D'Angelo, Dr. Fang and Dr. Rosenberg. There is no support for plaintiff's contention that he suffered from additional impairments that were improperly omitted from the

RFC.  Plaintiff has not set forth any other argument with respect to the ALJ's assessment at step five of the sequential analysis.  Thus, the ALJ did not commit reversible error when he failed to include opinions regarding plaintiff's potential for absenteeism and diminished work pace into the RFC.[22]

## CONCLUSION

For the reasons stated above, it is hereby **ORDERED** that plaintiff's letter motion seeking the Court's consideration of his reply brief (Dkt. No. 16) be **GRANTED**; and it is further **RECOMMENDED** that the Commissioner's decision denying disability benefits be **AFFIRMED** and plaintiff's motion for judgment on the pleadings (Dkt. No. 13) be **DENIED**.

Pursuant to 28 U.S.C. §636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993); *Small v. Sec'y of Health & Human Servs*., 892 F.2d 15 (2d Cir. 1989); 28 U.S.C §636(b)(1); FED R. CIV. P. 72, 6(a), 6(e).

It is further **ORDERED** that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:  May 20, 2014
        Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

---

[22] While defendant addresses the ALJ's credibility analysis and the analysis of plaintiff's mental impairments in the brief in opposition to plaintiff's request for remand, plaintiff did not challenge the credibility assessment and thus, these issue are not properly before this Court.